UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
COVINGTON

| BELINDA RUTH WARD, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | Civil No. 09-212-ART |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION &** |
| MICHAEL J. ASTRUE, | ) | **ORDER** |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

One of Belinda Ward's treating physicians—whose opinion, she says, deserves great deference—opined that the Ms. Ward was *not* eligible for disability benefits. This, among other things, justified the ALJ's decision to deny the plaintiff's claim.

### BACKGROUND

At least as early as September 2005, the plaintiff began suffering pain in her back, shoulder, knees, and hands. Tr. at 167; *see also id.* at 248 (September 2005 treatment note memorializing plaintiff's claim to have suffered back pain two-and-a-half years before); *id.* at 301 (note from 1993 reflecting complaint of shoulder pain). She consulted with a number of doctors. *See id.* at 319. Though medication apparently helped, *see, e.g., id.* at 245, 492, the plaintiff was in and out of work. *See id.* at 242 (November 2005 note from Dr. Hansen saying, "I am keeping her off work until approximately 2/1/2006 because of the discogenic component and the low back pain."); 240 (December 2005 note from Dr. Hansen saying the plaintiff was "pleased that she has been able to return to work with reduction in her low back pain"); 489

(December 2006 note that the plaintiff had been out of work since September). She stopped working completely in March 2006. *Id.* at 262.

One of her physicians was Dr. Colglazier, whom she met for the first time around October 2006. She complained of "widespread pain in the arms, legs, and back as well as fatigue." *Id.* at 489. He diagnosed her with fibromyalgia, *see id.* at 311, 491-92, which he said was the main source of her pain, *id.* at 34. Dr. Colglazier noted that the plaintiff had no "boney joint deformities, erythema, warmth, effusion or tenderness of the hands, wrists, knees, ankles, or toes" and that her gait was normal. *Id.* He also repeatedly recommended that she try water therapy through early 2008. *Id.* at 490, 483, 478, 475, 474. She did attempt physical therapy but told Dr. Colglazier she could not continue because her trainer pushed too hard. *Id.* at 489. On October 10, 2007, Dr. Colglazier told the plaintiff that he did not feel surgery on her back, knee, or elbow would help with her pain. *Id.* at 475. He also "encourage[d] her to be as active as possible," including "conditioning therapy and exercise." *Id.* He "d[id] not have restrictions that would qualify her for Disability at t[hat] point," though the plaintiff asked him to fill out disability paperwork. *Id.* In August 2008, Dr. Colglazier completed a fibromyalgia questionnaire, reporting that the plaintiff felt tenderness in all eighteen possible fibromyalgia tender points, had "good days" and "bad days," and was likely to be absent from work more than four days a month. *Id.* at 561-62.

Also during this time, the plaintiff was a regular patient of Dr. Hartig's—her primary care physician. *See id.* at 379-420, 40. He completed a Physical Capacities Evaluation form on June 9, 2008. *Id.* at 550. There, he reported that the plaintiff could sit, stand, and walk for one hour

at a time and could sit for a total of two hours per day, stand for one hour per day, and walk for one hour per day. *Id.* at 551. He added that the plaintiff could occasionally lift, carry, push, or pull ten pounds. *Id.* And, while the plaintiff could occasionally drive, frequently balance herself, and occasionally reach at waist level, she could never climb, stoop, kneel, crouch, or reach above her shoulder or below her waist. *Id.* Dr. Hartig also reported some limits on the plaintiff's motor skills. *Id.* at 553. Yet just two months later, Dr. Hartig completed a Medical Assessment of Ability to Do Work-Related Activities form. *Id.* at 545. This time, he noted that the plaintiff could occasionally lift fifteen pounds for not more than two-and-a-half hours per day and lift a half pound for between two-and-a-half and five hours per day. Dr. Hartig also reported that the plaintiff could stand for a total of two hours a day, though she could not do so without interruption. *Id.* at 546. He further explained that the plaintiff could sit between three and four hours a day, though not without interruption. *Id.* Notably, Dr. Hartig predicted that the plaintiff could climb, balance, stoop, crouch, kneel, and crawl "frequently"—"for short periods totaling from 2.5 hrs. to 5 hrs. during the workday." *Id.* at 547. And, finally, he said that the plaintiff's ability to reach, handle, finger, and push or pull were impaired. *Id.*

The plaintiff applied for disability benefits in September 2006. *Id.* at 10. In October 2006, she completed a Function Report, where she noted that she was unable to get out of bed between seven and ten days a month but was otherwise able to stretch and do therapeutic exercises after waking up. *Id.* at 158-59. She disclosed that she is capable of doing some simple chores and can sometimes drive herself to the grocery store. *Id.* at 161-62. The pain, she said, affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb the stairs, concentrate,

3

and use her hands. *Id.* at 164. But the agency denied her application, and the plaintiff sought a hearing, which was held on September 12, 2008. *Id.* There, she testified that she was in constant pain in her back, hip, and hands, *id.* at 28; that the pain placed limits on her ability to walk, bend, and stop, *id.* at 35, to lift more than five pounds, *id.* at 36, to sit for prolonged periods, *id.*, to sleep, *id.* at 39, to shower and cook, *id.* at 40-41, to use her hands, *id.* at 51, and to drive, *id.* at 24. She also testified that she has and would participate in physical therapy, *id.* at 30, and that her previous job as an investment cashier did not involve any heavy lifting, *id.* at 26.

The ALJ denied her application. He followed the routine five-step process for analyzing her claim, *id.* at 10-17, and concluded the plaintiff does have several "severe" impairments—degenerative disc disease of the lumbar spine, fibromyalgia, and mild joint symptomatology. *Id.* at 12. But he explained that the intensity of her symptoms was not what she alleged, *id.* at 14, and that she still enjoyed the residual functioning capacity to perform light exertional work—occasionally lifting twenty pounds, frequently lifting ten pounds, and standing or sitting six hours a day, for example. *Id.* at 13. Reaching that conclusion, the ALJ took note of a post operative exam which revealed a greater range of motion than the plaintiff would admit, *id.* at 14; Dr. Colglazier's note that she had no bony joint deformities or erythema, warmth, effusion, or tenderness in her hands, wrists, elbows, knees, ankles, or toes, *id* at 15; Dr. Colglazier's recommendation that the plaintiff be as "active as possible" and that she seek physical therapy; Dr. Colglazier's opinion, memorialized in his own treatment records, that the plaintiff had no disabling restrictions, *id*; and Dr. Due's records reflecting that the plaintiff enjoyed "good

4

motion" in a variety of joints, *id.* He also discounted contrary opinions by Dr. Colglazier and Dr. Hartig because their own records, and the records of other physicians, were contradictory. *Id.* at 15. And the ALJ noted that state agency opinions supported his view that the plaintiff was capable of light exertional work. *Id.* One from December 2006 concluded, among other things, that the plaintiff could occasionally lift or carry twenty pounds, frequently lift ten pounds, stand six hours a day with normal breaks, and sit six hours a day with normal breaks, and that the purported severity of the plaintiff's symptoms was "not supported by longitudinal objective MER provided." Tr. at 372-78. The other from April 2007 reached the same conclusions. *Id.* at 431-38. Completing his analysis, the ALJ accepted testimony from a vocational expert that the plaintiff could do some of her past relevant work and that appropriate work was available. *Id.* at 16-17. The Appeals Council denied the plaintiff's request for review, *id.* at 1-3, and this case followed.

## DISCUSSION

No matter how the Court would have weighed the evidence itself, and no matter whether substantial evidence could also support the plaintiff's preferred result, the Court must affirm the ALJ's decision because it relied on substantial evidence. *Smith v. Chater*, 99 F.3d 780, 781-82 (6th Cir. 1996). He took account of medical records undercutting the plaintiff's claims of disability—including one treating physician's view that she was not disabled—and appropriately discounted contrary opinions.

The plaintiff disagrees, arguing first that the ALJ improperly weighed the opinions of several physicians. She says that the ALJ wrongly discounted the pro-plaintiff opinions of two

5

treating physicians—presumably Dr. Colglazier and Dr. Hartig (though her brief is unclear on this point), *see* R. 6, Attach. 1 at 1-14. Dr. Colglazier, she emphasizes, completed a fibromyalgia questionnaire, noting that the plaintiff suffered widespread pain—including tenderness in all eighteen potential tender spots. *Id.* at 2. And Dr. Hartig, she highlights, opined that she suffered diminished mobility and motor skills. R. 6, Attach. 1 at 10-11. Because these and other physicians' medical records supported these opinions, she says, the ALJ was not entitled to discount them. *Id.* at 2.

This argument is self-defeating from the get-go. One of these two treating physicians—the one who diagnosed her with fibromyalgia—specifically opined that the plaintiff was *not* eligible for disability benefits. Asked to fill out paperwork for her disability claim in October 2007,[1] Dr. Colglazier noted that he did "not have restrictions to place on her ability to stand, walk or lift. [He did] not have restrictions that would qualify for Disability at th[at] point[.]" Tr. at 475. He added that he encouraged the plaintiff to be "as active as possible" and to start conditioning therapy. *Id.* In fact, encouraging the plaintiff to try water therapy was a constant with Dr. Colglazier, continuing into early 2008. *Id.* at 490, 483, 478, 475, 474. Notably, Dr. Due—whom the plaintiff consulted about finger pain—similarly observed in July 2008 that the plaintiff was agile: She had "good motion of her shoulders, elbows, hands, [neck], and fingers." *Id.* at 535.

---

[1] The plaintiff argues that "[t]he Commissioner was not entitled to conclude that because plaintiff had improved by her last visit, she was not disabled." R. 6, Attach. 1 at 14. It is unclear what she is talking about. Whatever it is, it would not be this October 2007 visit. The plaintiff continued to see Dr. Colglazier into 2008.

6

The plaintiff's responses to this are confusing and unsupported. She says first that the October 2007 request for disability paperwork was for "her long term disability case. The ALJ did not have that form and does not know what restrictions were put on her ability to stand walk or lift." R. 6, Attach. 1 at 1-2. She follows this with no citation to anything in the record. To the extent the plaintiff is arguing that the ALJ misconstrued Dr. Colglazier's statement because the record is missing documentary evidence—presumably evidence she could have provided—she is out of luck. The ALJ was bound to base his decision on "evidence offered at the hearing or otherwise included in the record." 20 C.F.R. § 404.953(a); *see also Yang v. Shalala*, 22 F.3d 213, 217 (9th Cir. 1994) (holding that it is error for an ALJ to base his decision on evidence outside the record). Next, the plaintiff argues that the "ALJ failed to consider all the records from this treating rheumatologist [and] [t]he ALJ failed to consider that there were 18 out of 18 widespread tender points during the July 17, 2008 exam." R. 6, Attach. 1 and 1-2. First things first: The ALJ *did* take note of the plaintiff's tenderness in all eighteen potential fibromyalgia tender spots—twice. Tr. at 12, 14. What's more, the plaintiff fails to support the broad claim that the ALJ neglected to consider all of Dr. Colglazier's records with cites to any specific, unconsidered Colglazier records (with the possible exception of one record about thumb injections, discussed below). It is true that she later catalogues a series of visits with Dr. Colglazier, briefly describing some of her complaints and his assessments. *Id.* at 6, 10. But none of her descriptions directly touches on her mobility or lifting capacity. Indeed, some say nothing about it, like the note that her medication caused headaches in December 2006 or the note that Dr. Colglazier completed the fibromyalgia questionnaire in August 2008. *Id.* At bottom, the list

7

largely supports the uncontroversial proposition that she suffered from fibromyalgia–not necessarily that its intensity was worse than the ALJ concluded. Finally, the plaintiff argues that Dr. Colglazier "injected both [of the plaintiff's] thumbs and stated that there was tenderness in both hands, right shoulder pain to internal rotation and medication was again changed." *Id.* at 2. But, again, the plaintiff offers no explanation why this is inconsistent with Dr. Colglazier's view that the plaintiff was truly ill but not disabled.

Regardless, the plaintiff is wrong that the ALJ improperly discounted Dr. Colglazier's and Dr. Hartig's opinions. An ALJ is entitled to discount a treating physician's opinion where inconsistent evidence appears in the record, 20 C.F.R. § 404.1527(d)(4). And, here, the ALJ appropriately gave "good reasons" for discounting the opinions of both physicians on the theory that both were inconsistent with record evidence. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545 (6th Cir. 2004) (holding that ALJ's must give "good reasons" for not giving treating physician opinions controlling weight). As mentioned above, the ALJ discounted the opinions Dr. Colglazier offered in favor of the plaintiff because Dr. Colglazier himself elsewhere opined that the plaintiff "did not have disabling restrictions and he placed no restrictions on her ability to stand, walk or lift." Tr. 15. Furthermore, the ALJ noted, Dr. Colglazier's treatment notes disclose that the plaintiff enjoyed a "full range of motion in the upper and lower extremities, no bony deformities, warmth, effusion of the hands, wrists, elbows, shoulders, hips, knees, and ankles." *Id.* And Dr. Colglazier actually encouraged the plaintiff to be active and seek conditioning therapy. *Id.* Respecting Dr. Hartig, the ALJ observed that his own reports were inconsistent. *Id.* Some examples: Dr. Hartig opined in July 2008 that the plaintiff could "never"

8

lift more than ten pounds. Tr. 551. Yet in August 2008 he said she could occasionally lift fifteen. *Id.* at 545. And while Dr. Hartig predicted the plaintiff could sit for a total of two hours per day in July 2008, he predicted three to four hours in August. *Id.* at 551, 546. What's more, the ALJ noted, Dr. Hartig's assessments were inconsistent with contemporaneous assessments by Dr. Due and Dr. O'Brien. On July 2, 2008, Dr. Due noted that the plaintiff enjoyed widespread joint mobility and no joint effusions or deformities. *Id.* at 535. This echoes Dr. O'Brien's opinion from a year earlier, which also noted that the plaintiff enjoyed a full range of motion in her shoulder. *Id.* at 537.

Urging the Court to nonetheless give Drs. Colglazier and Hartig controlling weight, the plaintiff dedicates nearly eleven pages of her brief to cataloguing visits to various doctors since September 2005. She apparently believes the list incontrovertibly corroborates the view that she is disabled—arguing both that "[w]here the medical evidence is consistent, and supports plaintiff's complaints of the existence and severity of pain, the ALJ may not discredit plaintiff's testimony and deny benefits," R. 6, Attach. 1 at 2, and that where a treating physician's opinion is "well supported by [medical evidence] and is not inconsistent with the other substantial evidence in the case record, it must be given controlling weight," *id.* at 13 (citing 20 C.F.R. §§ 404.1527(d)(2)). But the record evidence is simply not down-the-line consistent with the opinion that the plaintiff is incapable of light exertional work. Dr. Colglazier believed the plaintiff was not disabled. Dr. Due corroborated his belief. Records following the plaintiff's 2008 back surgery say that she was "doing reasonably well," had a "normal gait" and "normal . . . strength and sensation." Tr. at 500, 502. And, as described above, state agency analysis

9

from 2006 and 2007 supports the ALJ's assessment. At the very best, then, this catalogue would show that substantial evidence could *also* support the plaintiff's preferred outcome—which is not enough. *Chater*, 99 F.3d at 781-82.

She also contends that the ALJ erred in giving "significant weight" to the two state agency opinions hostile to the plaintiff's disability claims. *Id.* at 1, 14; Tr. at 15. She argues that a non-examining physician's opinion "cannot constitute substantial evidence to overcome the properly supported opinion of a physician who has treated a claimant over a period of years." R. 6, Attach. 1 at 14. And she further complains that these non-examining opinions are unreliable because they were rendered as far back as 2006, when "numerous records regarding her hands, shoulder, elbow, knee, and 2008 back surgery were not in the record." *Id.* at 1.

But the plaintiff has drifted away from the facts of this case. This is hardly a case which pits the amply supported opinion of a treating physician against the lonely opinion of a non-treating physician. *See, Germany-Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 776 (6th Cir. 2008) (holding that treating physician's opinion is entitled to greater weight where it is well supported by the evidence). Nor is it a case where the ALJ gave the non-examining expert opinions—opinions, incidentally, he must consider—controlling weight. *See* 20 C.F.R. § 404.1527 (requiring the ALJ to consider state agency opinions "except for the ultimate determination about whether [the claimant is] disabled"). Rather, it is one where the ALJ looked to the views of non-treating experts alongside all the other evidence—indeed, he specifically noted that the agency assessments were "consistent with the consensus of the evidence"—to help resolve a conflict among treating-physician opinions. Tr. at 15. In cases like this one, "[t]he

opinion of a medical expert who has not examined the claimant [] is not automatically entitled to less deference than that of a treating physician." *Matelski v. Comm'r of Soc. Sec.*, No. 97-336, 1998 WL 381361, at *5 (6th Cir. June 25, 1998).

Furthermore, the fact that the 2006 and 2007 assessments did not include certain records does not disqualify them. In *McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009), for instance, the Sixth Circuit rejected an argument that an ALJ improperly relied on state agency opinions because they were out of date and did not account for certain changes in the claimant's condition. The court reasoned that, while the state agency may not have seen the records and considered them, the ALJ did. *Id.* Here, the plaintiff makes no argument that the ALJ failed to consider evidence previously unavailable to the state agency.

As a fall back, the plaintiff argues that the ALJ incorrectly assessed evidence of one of her ailments—fibromyalgia. Fibromyalgia is unique because its victims "present no objectively alarming signs" of the disease. *Rogers*, 486 F.3d at 244. The plaintiff therefore argues that the ALJ improperly relied on objective evidence when evaluating her claims. Instead, she insists, the ALJ could only consider subjective evidence. R. 6, Attach. 1 at 14-16. But this argument overlooks an important nuance. It is true that an ALJ cannot rely "solely" on objective evidence to dispute a claimant's initial fibromyalgia *diagnosis*. *Rogers*, 486 F.3d at 245. And it is true that, at some level, an ALJ must also avoid over-reliance on objective medical evidence when assessing the "severity" of a claimant's fibromyalgia. *Preston v. Sec. of Health and Human Servs.*, 854 F.2d 815, 820 (6th Cir. 1988). But as a panel of the Sixth Circuit recently held, it is appropriate to consider objective evidence of the ultimate claim that a patient's properly-

11

diagnosed fibromyalgia was actually disabling—objective evidence of the "physical limitations imposed by the symptoms of the illness." *See Huffaker v. Metro. Life Ins. Co.*, 271 F. App'x 493, 500 (6th Cir. 2008) (citing *Boardman v. Prudential Ins. Co.*, 337 F.3d 9, 16-17 n.5 (1st Cir. 2003)). At least, the Court held, it is appropriate where, as here, the initial denial letter notified the claimant that there was inadequate medical evidence to support her claim of disability. *Huffaker*, 271 F. App'x at 500; Tr. at 82 ("There is no other significant impairment in your medical records that would prevent you from simple work that is not physically demanding."). And rightfully so. If ALJs were not permitted to consider objective evidence at any stage of the game, fibromyalgia patients would be virtually per se disabled—despite the Sixth Circuit's rule to the contrary. *See, e.g., Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 806 (6th Cir. 2008) (holding that diagnosis of fibromyalgia does not automatically entitle claimant to disability payment).

The ALJ followed this framework. He agreed with the plaintiff that she suffers from fibromyalgia. He even agreed with the plaintiff that it was a "severe" impairment. Tr. at 12. And once he reached the step of determining the plaintiff's residual functioning capacity, he acknowledged that she faced "significant limitations." Tr. at 6. But, at that late stage, he looked to both subjective and objective evidence to determine whether she was capable of at least light exertional work. He discounted the plaintiff's complaint of fatigue as a disabling symptom—otherwise a common feature of fibromyalgia, *Huffaker*, 271 F. App'x at 500 n.2 (citation omitted)—because she had previously attributed her low energy level to family-related stress. Tr. at 5. And he noted multiple instances in which the plaintiff's medical records

reflected "good motion" or a "full range of motion" in her joints and extremities. Tr. at 5-6. This latter "objective" observation may well be unconvincing when reviewing a claimant's initial fibromyalgia diagnosis, *see, e.g., Rogers*, 486 F.3d at 243-44 (noting that fibromyalgia patients often enjoy full range of motion while evaluating claimant's diagnosis). But, when reviewing whether the claimant's fibromyalgia is disabling, it is hardly any different from other courts' reviewing claimants' daily activities for outwardly observable evidence of true disability. *See, e.g.*, *Moore v. Barnhart*, 405 F.3d 1208, 1212-13 (11th Cir. 2005); *cf. Rogers*, 486 F.3d at 247-48.

But set all this complexity aside. The ALJ also relied on at least one species of clearly appropriate evidence—a treating physician's opinion. Courts routinely look to treating physicians' opinions to evaluate fibromyalgia claims: "A treating physician's testimony can be particularly valuable in fibromyalgia cases, where objective evidence is often absent." *Price v. Astrue*, No. 09-59, 2010 WL 3715643, at *5 (M.D. Ga. Aug. 16, 2010). For example, in *Preston*, the Sixth Circuit panel ultimately relied upon a long-time treating physician's opinion to confirm that the claimant suffered severe fibromyalgia. 854 F.2d at 820. Similarly, in *Vance* the Sixth Circuit panel relied on a doctor's statement that the claimant's fibromyalgia improved or remained stable to credit the ALJ's view that the claimant's symptoms were not severe. 260 F. App'x at 805, 806-07. And in *Brazier v. Sec. of Health and Human Servs.*, the Sixth Circuit panel accepted an ALJ's view that a claimant's claims of disabling fibromyalgia pain were not credible partly because "no treating or examining physician had assessed that [the] claimant [was] disabled, either as a result of fibromyalgia, or any of the other impairments from which she

13

suffers[.]" No. 94-5374, 1995 WL 418079, at *9 (6th Cir. July 13, 1995) (internal quotation marks omitted). Here, the ALJ specifically observed that Dr. Colglazier—a long-term treating physician who diagnosed the plaintiff with fibromyalgia—"made it very clear that in his opinion the claimant did not have disabling restrictions and he placed no restrictions on her ability to stand, walk, or lift." Tr. at 15. The ALJ properly considered this evidence, and therefore properly discounted the plaintiff's claims of disability. *See* Tr. 14 (holding that the plaintiff's claim of intensity was not credible insofar as it was inconsistent with the record evidence, including Dr. Colglazier's opinion).

## CONCLUSION

For the foregoing reasons, the plaintiff's motion for summary judgment, R. 6, is **DENIED**, and the defendant's motion for summary judgment, R. 7, is **GRANTED**.

This the 12th day of October, 2010.

Signed By:
*Amul R. Thapar* AT
United States District Judge